UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>JOSHUA NATHAN KELLY,<br><br>        Defendant. | Case No. 4:20-cr-00191-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Joshua Kelly's Motion to Suppress. Dkt. 17. On February 24, 2021, and March 9, 2021, the Court held oral argument. The parties filed closing argument briefs on March 19, 2021, and the Court then took the matter under advisement. For the reasons outlined below, the Court finds good cause to DENY the motion.

## II. BACKGROUND

On July 15, 2020, Officers Kevin Goms and Tyler Howard went to a house located at 320 E. 15th Street, in Idaho Falls, Idaho to investigate a previous theft case with a suspect, Anthony Hoff, who resided there. Upon arriving at the house, the officers observed a tan Buick sedan without license plates parked in the driveway. The car's trunk and driver's door were open. An unknown male was leaning over in the vehicle and next to the vehicle.

As the officers approached, the unknown male (later identified as Joshua Kelly) stood up and moved towards the side of the residence. Officer Goms walked to the driveway and observed Kelly standing at the back of the driveway wearing blue jean shorts, a white tank top, and a face mask. At that time Kelly looked at Officer Goms, and then stepped into the backyard. Officer Goms walked to the backyard to see if Kelly was back there, or if the homeowner was out back with him. Kelly was not back there, and Officer Howard informed Officer Goms that Kelly was seen running northbound on Emerson Avenue. Nearby officers were contacted and asked to assist in finding Kelly.

Officer Goms again observed the tan Buick that was located part way up the driveway. A second car was parked at the end of the driveway. There was space between the two vehicles. On the Buick, the driver's side front and back doors were open. The trunk was also open. A backpack was observed on the ground near the Buick.

Officer Goms knocked on the front door to contact the homeowner or resident of the house. Officer Howard stood directly across the driveway from the front door, near the Buick, while Officer Goms knocked multiple times. This was done for officer safety reasons so that Officer Howard could maintain a full visual given an unknown person had just fled. Officer Howard informed Officer Goms that there was a gun visible in the backpack. Officer Goms walked over to the driver's side of the car and observed the butt of the gun was sticking out of the backpack.

Immediately after observing the gun, Officer Goms knocked on the front door several more times to locate the possible owner of the gun. After no one answered, Officer Goms suggested running the registration on the Buick to see to whom it belonged.

Approximately a minute and half after observing the gun, Officer Howard picked up the backpack and carried it to the hood of the car. Officer Goms continued to knock on the front door to contact anyone at the house who might know about the gun.

After several attempts to contact the occupants of the residence or owner of the gun at the front door, Officer Goms walked to the back yard. He proceeded quickly to the back door and knocked several times. He waited for a few moments with no response before walking back towards the front of the house and knocking on the front door again. Officer Howard proceeded to examine the contents of the backpack, locating a second firearm and a large amount of suspected controlled substances. The officers were then advised by dispatch that the firearm was reported stolen. Officer Goms told Officer Howard that he believed the male might have been "Josh Kelly." Officer Goms was familiar with Kelly and knew that he had active felony warrants for his arrest at the time.

The officers remained in the driveway for some time before they packaged the firearms into evidence bags and secured them. After the guns were secured, the officers left the area.

Officer Goms returned to the home a short time later and observed an individual in the tan Buick. Officer Goms identified the individual as Kelly— the same male who had fled from the residence earlier. When Officer Goms attempted to contact Kelly, he ran away from Officer Goms a second time. After a chase, Kelly eventually surrendered himself to the police.

In a later interview under *Miranda*, Kelly told police that the Buick was not his, but later admitted that he had been driving it for the past few days and that it belonged to a

female named Alicia. Kelly said he went to the house because he did not have anywhere else to go. He told police that he knocked on the door and no one responded. He also told police he tried to use a code to enter, but it did not work. He began placing his items in his car. Kelly initially denied ownership of the backpack, but later admitted that it was his. He denied knowledge of the firearms and controlled substances located in the backpack.

### III. DISCUSSION

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment requires suppression of evidence that is the fruit of unlawful police conduct. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

#### A. Lack of Standing

The Government argues that Kelly lacks standing in this matter because, during a post arrest interview, Kelly did not list 320 E. 15th Street as his residence, he made the statement to the police that "he had nowhere else to go," and when he got to that residence, he knocked on the door and no one answered.

At the evidentiary hearing, Kelly called two witnesses, Kiah Ritter and Bree Klungness. Each witness testified that Kelly resided at 320 E. 15th Street. Ms. Ritter said that she was a roommate of Kelly's and that they shared the basement. Ms. Ritter also signed an Affidavit wherein she provided a copy of a Lease Agreement, dated June, 2020, that was signed by Kelly and the owner of the home, Anthony Hoff.

Ms. Klungness testified that she gave Kelly a ride in June, 2020, to move some of

his personal items into the 15th Street residence. Ms. Ritter testified that after she was released from the east Boise Women's Work Center, on or about May 22, 2020, she moved into the 15th Street house. According to Ms. Ritter, Kelly was already living at the 15th residence when Ritter moved in. There are some inconsistencies as to whether Kelly was actually living at the residence in the summer of 2020. Ms. Ritter provided a Lease Agreement, dated June 6, 2020. However, the agreement lists the term of the lease as "12:00 noon on June 1, 2019 and ends at 12:00 noon on June 7, 2020. *See* Dkt. 23-1. This Lease Agreement, if taken on its face, is contradictory to the testimony provided by Ms. Klungness and Ms. Ritter[1]. Ms. Ritter went on to testify that Kelly was still a resident at the time of Kelly's arrest on July 15, 2020.

The Supreme Court has held an overnight guest has a reasonable expectation of privacy in a friend's residence even though he has no legal interest in the premises and does not have legal authority to determine who may enter the household. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). At this point, the Court cannot determine if Kelly was a resident, an overnight guest, or simply a friend coming over to do his laundry.[2] Viewing the totality of the circumstances, which includes a conflict of facts on this issue, the Court is going to weigh on the side of caution and assume for sake of argument that Kelly has

---

[1] That said, Ms. Ritter's testimony is more consistent with the term in the Lease Agreement. That is that Kelly was already living there in May, 2020, when she was released from prison. It would make more sense for him to live at the 15th Street residence in May, 2020, because his lease was not up until June 7, 2020 at noon.

[2] The government argues that during the booking process, Kelly listed a different address as his residence, which is his mother's residence, and that during his post-*Miranda* interview, he told detectives that he was at Hoff's to do his laundry.

standing to assert the protection of the Fourth Amendment.

## B. Curtilage

Accordingly, the Court next addresses the issue of curtilage. Kelly argues that Officers Goms and Howard breached his privacy rights in the curtilage of the home by wandering from the doorstep path, across the driveway and to the grassy area between the two homes. The Court must first determine if the grassy area, where the backpack was found is considered an extension of the home or "curtilage." In *United States v. Dunn*, 480 U.S. 294 (1987), the Supreme Court reaffirmed that the Fourth Amendment protects the curtilage of a house and "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* at 300. The *Dunn* Court identified four principal factors that should be applied in determining what portion of the property is included with the curtilage of the home. *Id.* at 301. These factors are:

1.  The proximity of the area claimed to be curtilage to the home;

2.  Whether the area is included within an enclosure surrounding the home;

3.  The nature of the uses to which the area is put; and

4.  The steps taken by the resident to protect the area from observation by people passing by.

Applying these factors to the grassy area where the backpack was found, the Court concludes that the backpack was not within the curtilage of the home. First, the grassy area was located between the driveway of the home in question and the neighboring home. Thus, the distance of the grassy area from the home weighs against it being curtilage.

Second, the grassy area was not enclosed. Although there was a very short fence to the left of a shed/garage by the grassy area, a reasonable person would believe that this was the next-door neighbor's attempt to "mark" their backyard property line. Simply put, the grassy area was not enclosed, which weighs against the area being curtilage Third, there is nothing stored on the grassy area between the two houses. It appears to simply be an area that is used to separate the two properties. Thus, the nature of the area indicates that it is not curtilage. Fourth, neither homeowner did anything to shield or protect that area from observation by people passing by. A person walking on the sidewalk could observe anything left on that grassy area, meaning the final factor demonstrates that the grassy area is not curtilage Therefore, under the *Dunn* factors, the grassy area near the driveway is not curtilage, and anything found there would not be afforded the curtilage protection due under the Fourth Amendment.

### C. Trespass

As the Court has determined that the grassy area is not curtilage, the Court will now address whether Officers Goms and Howard trespassed on the property to obtain the backpack. The defense acknowledges that exigent circumstances such as hot pursuit can justify warrantless entry onto a home's curtilage. However, the Government must show that: (1) the officers had probable cause to search the home; and (2) exigent circumstances justified the intrusion. *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010). Officer Goms and Howard did not have probable cause to arrest Kelly when he ran away as they didn't even know who he was at the time. They also could not secure a search warrant because they were told that they did not have enough evidence to secure one for

the home. No exigent circumstances existed. The officers did not perform their search of the curtilage for officer safety; they did it to find evidence. Dkt. 17, at 17–18.

For its part, the Government argues that Officers Goms and Howard were at the house to conduct a police investigation into the owner, Anthony Hoff. Officer Goms initially walked into the backyard through an open gate, believing that the person he was looking for might be in the backyard. After a brief scan of the backyard, Officer Goms walked back to the front of the house and knocked on the front door. A few minutes later the backpack with the gun was observed by Officer Howard, who was standing on the driveway across from the front door. These actions are not inconsistent with what citizens would expect from law enforcement attempting to talk to someone they think may have been involved in a crime and certainly justify their initial presence at the residence. Dkt. 20, at 11.

The term "'hot pursuit' means some sort of chase." *United States v. Santana*, 427 U.S. 38, 43 (1976).  One could argue that other officers who pursued Kelly were in "hot pursuit", but Officers Goms and Howard were not. There was not a chase. Officer Goms simply followed him to the backyard where he disappeared. Officer Goms looked around and then came out of the backyard to the driveway. The backyard of a house has repeatedly been held to be within the curtilage of a house and thereby protected from a warrantless search under the Fourth Amendment. *United States v. Van Dyke*, 643 F.2d 992, 994 (4th Cir. 1980); *Fixel v. Wainwright*, 492 F.2d 480, 483 (5th Cir. 1974); *United States v. Davis*, 423 F.2d 974, 976 (5th Cir. 1970). The bottom line is that exigent circumstances did not exist for Officer Goms to continually go in and out of the backyard, and later take a laundry

hamper out of the backyard and place it on the driveway where he eventually went through the contents of the hamper and found meth. That said, Kelly was not charged with anything that was found in the hamper.

Kelly also argues that in order for Officer Howard to find the backpack that he had to trespass on the driveway to reach the grassy area. Officer Howard testified that he was in the driveway for officer safety reasons. Officer Goms was the contact officer and was knocking on the front door of the house. Officer Howard was the cover officer. His primary job as the cover officer was to protect Officer Goms by making sure he could observe the houses to the side of them, the street, and what was in front of them from where he was at. From his position, he observed that the driver door of the tan Buick was open, the trunk was open, and that a firearm was stuck in the side pocket of a backpack with the handle sticking up. *See* Dkt. 28, at 11–12.

A warrant is not required to observe readily visible items within the curtilage, and "officers [need not] shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). This Court has already ruled that the grassy area to the left of the driveway does not meet the curtilage test under the *Dunn* factors. The test in each case should be that of reasonableness, both of the possessor's expectations of privacy and of the officers' reasons for being on the driveway. *United States v. Magana*, 512 F.2d 1169, 1171 (9th Cir. 1975). Under the circumstances of this case, the Court finds no reason to suggest that the Officers were deviating from standard safety protocols and concludes that they were not trespassing.

### D. Abandonment of Backpack

Kelly argues that even if the officers saw a gun sticking out of the backpack, they did not have probable cause to search. Idaho and federal constitutions guarantee a person's right to keep and bear arms…Given these protections and the holding in *U.S. v. Brown*, 925 F.3d 1150, 1157 (9th Cir. 2019), a gun's mere presence cannot justify its seizure or a search." Dkt. 17, at 19.

The Government argues that Kelly abandoned the backpack and contents when he left it, ran away from the area, and initially denied ownership of it. Persons who voluntarily abandon property do not have standing under the Fourth Amendment. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). Officer Goms and Howard reasonably believed that the backpack was abandoned in the grassy area…Here, when the officers approached the house, they observed [Kelly] standing on the driver's side of the car, near the rose bushes on the neighboring property and in the same approximate location where the backpack was later found. [Kelly] walked away from the area and eventually fled from the property without the backpack. He could have just as easily taken it with him when he ran but he chose not to. This supports the reasonable conclusion by the officers that the backpack was abandoned. Dkt. 20, at 12.

The Government additionally argues that Anthony Hoff, who was the owner of the home and the suspect the officers were looking for, was a known convicted felon. Leaving a firearm unattended on the property where the occupants were known to the police to have been involved in a violent crime is reckless. Indeed, the very nature of an unattended firearm exposed and within easy reach of any passerby raised a significant community

caretaking responsibility on behalf of Officers Goms and Howard and required them to secure the firearm and attempt to locate the owner.

Warrantless searches by law enforcement officers "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (emphasis added). One exception to the Fourth Amendment's warrant requirement is the "community caretaking" exception. *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973). In *Cady*, the Supreme Court upheld a warrantless search of a vehicle, even though no probable cause existed to believe the vehicle contained illegal evidence, where the sole justification for the search was the caretaking function of the police to protect the community's safety. *Id.* at 436.

Here, the officers' search of the backpack in the grassy area was reasonable on two grounds: the community caretaking doctrine and the plain view doctrine. First, it is common sense that if there is a gun hanging out in plain view with no one around to "take care" of it, law enforcement may secure that gun for protection of life. Additionally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object, which is precisely what occurred in this case. *See Harris v. United States*, 390 U.S. 234, 236 (1968). Goms and Howard testified that they attempted several times to locate someone in the house. The body cam footage shows multiple attempts by Goms to get someone to come to the front door. No one answered the door. It was reasonable for the Officers to secure that firearm. Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by

law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citations omitted).

Moreover, the 15th Street home was located on a busy street. During the law enforcement video, you can see cars going up and down that road. There is an apartment complex across the street, and at some point, a pedestrian walked on the sidewalk by the grassy area where the gun was found. It is reasonable to conclude that the gun posed a danger to public safety and citizens would expect law enforcement to secure the firearm to protect them from any danger that gun could pose.

Kelly chose to leave his unattended backpack when he walked away from the officers. While the officers attempted to locate him at the residence, they did so unsuccessfully. Goms attempted to get a warrant from the Bonneville County Prosecutor's Office to enter the home. However, the Prosecutor declined to get a warrant at that time. "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 393–394 (1978). In short, exigent circumstances existed to secure the backpack to protect the public. The Government has met the requirements under the community caretaking exception to the Fourth Amendment requirement to obtain a warrant. Accordingly, while the Court assumed Kelly has standing in this case, the Court finds that the grassy area was not part of the curtilage of the home. As well, Kelly abandoned a backpack that contained a gun that could be seen in plain view. Exigent circumstances existed for Goms and Howard to secure that backpack. The Court therefore

DENIES Kelly's Motion to Suppress.

## IV. ORDER

IT IS HEREBY ORDERED:

1.  Kelly's Motion to Suppress (Dkt. 17) is **DENIED**.

DATED: May 25, 2021

David C. Nye
Chief U.S. District Court Judge